## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAMBRIDGE MOBILE TELEMATICS, INC. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 22-1260-RGA |
| ZENDRIVE, INC. | ) ) | |
| Defendant. | ) | |

### REPORT AND RECOMMENDATION

This dispute arises out of patent infringement litigation between Cambridge Mobile Telematics, Inc. ("CMT") and Zendrive, Inc. ("Zendrive"). Before the Court is Zendrive's Motion to Dismiss Counts II and IV of CMT's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (D.I. 14). In its Motion, Zendrive argues that two of the patents asserted against it—U.S. Patent No. 10,349, 219 (the "'219 patent") and U.S. Patent No. 10,967,872 (the "'872 patent")—are directed to patent-ineligible subject matter pursuant to 35 U.S.C. § 101. The Motion is fully briefed, complete with Supplemental § 101 Letters, (D.I. 29, 30), and I heard oral argument on the Motion on June 29, 2023. For the following reasons, I recommend that Zendrive's Motion to Dismiss be GRANTED.

### I.    Background

CMT and Zendrive are competitors in the field of telematics. (D.I. 1 at 2). CMT develops and commercializes mobile telematics and analytics technologies and holds several patents in the field. (*Id.* at 3–4). CMT's patents generally relate to solutions for improving safe driving behavior. (*Id.* at 4). CMT alleges that Zendrive is infringing several of those patents, (*Id.* at 3–5), though only the '219 patent and the '872 patent are at issue for the purposes of this motion.

FILED

JUL 2 8 2023

U.S. DISTRICT COURT DISTRICT OF DELAWARE

The '219 patent is titled "Methods and Systems for Combining Sensor Data to Determine Vehicle Movement Information."  It was issued on July 9, 2019.  According to the specification, the invention relates generally to "combining sensor data to determine vehicle movement information."  (D.I. 1-2 at 1:33–35).  The specification's improvement is to obtain "movement measurements . . . from a movement sensor of a mobile device in a vehicle" and "location measurements . . . from a location sensor of the mobile device in the vehicle," and then to "cross-reference[]" the "movement measurements and the location measurements . . . to remove erroneous measurements."  (*Id.* at 1:36–42).  Then, the "remaining measurements may be used to draw conclusions about the movements or locations."  (*Id.* at 1:43–45).

Claim 1 of the '219 patent reads as follows:

A method comprising:

> operating a movement sensor of a mobile device disposed in a vehicle to obtain a plurality of movement measurements;
>
> operating a location sensor of the mobile device disposed in the vehicle to obtain a plurality of location measurements;
>
> verifying, by a processor of the mobile device, a portion of the plurality of movement measurements using the plurality of location measurements;
>
> removing, by the processor, one or more movement measurements that are not verified from the plurality of movement measurements to provide a set of remaining movement measurements; and
>
> determining, by the processor, a movement event for the vehicle using the set of remaining movement measurements.

2

(D.I. 1-2). The '219 patent also recites various other claims. Claim 10 is independent and uses virtually the same language as claim 1, except that claim 1 recites a method whereas claim 10 recites a device configured to perform the operations of that method. Claims 2 through 9 ultimately depend from claim 1 (with claims 6 and 7 depending directly from claim 5), and claims 11 through 18 ultimately depend from claim 10 (with claims 15 and 16 depending directly from claim 14). (*Id.*). Each of these two sets recites the same limitations, except that claims 2 through 9 recite methods and claims 11 through 18 recite devices configured to perform the operations of those methods. (*Id.*) None of the claims specifically claim the movement or location sensors used in the mobile device, nor the idea of using those sensors to obtain movement and location measurements.

The '872 patent is titled "Methods and Systems for Presenting Collected Driving Data." It was issued on April 6, 2021. According to the specification, the invention relates generally to "collect[ing], analyz[ing] and transform[ing]" vehicle movement data from a "user having a mobile device," wherein "combinations of collected data and transformed data are used in different ways, including, but not limited to, reporting and displaying of the combinations." (D.I. 1-5 at 1:39–44). The specification's improvement is to use sensors in a mobile device to determine vehicle movement measurements and then display the information. (*Id.* at 1:55–63).

Claim 1 of the '872 patent recites:

A method of displaying vehicle movement information, the method comprising:

> obtaining a plurality of movement measurements by operating at least one sensor of a mobile device disposed in a vehicle during a drive;
> generating during the drive by a processor of the mobile device, an association of a subset of the plurality of movement measurements obtained

3

by operating the at least one sensor of the mobile device to at least one driving event indicating an interaction with the mobile device by a user during the drive;

generating, by the processor and using the association, a focused time metric indicating a percentage of the drive in which the user was focused and a mobile device interaction metric indicating a percentage of the drive in which the mobile device was in use during the drive;

generating, by the processor, a graphical image of the at least one driving event and the focused time metric and the mobile device interaction metric; and

displaying during the drive the graphical image on a display of the mobile device.

(D.I. 1-5). The '872 patent also recites various other claims, including claim 11, an independent claim which recites a computer-program product with instructions to perform the operations of the method recited in claim 1. (*Id.*). Claims 2 through 10 ultimately depend from claim 1 (with claim 6 depending directly from claim 5, claim 8 depending directly from claim 7, and claim 9 depending directly from claim 8), and claims 12 through 20 ultimately depend from claim 11 (with claim 16 depending directly from claim 15, claim 18 depending directly from claim 17, and claim 19 depending directly from claim 18). (*Id.*). Like the two sets of claims in the '219 patent, each of these two sets of dependent claims recites the same limitations, except that claims 2 through 10 recite methods whereas claims 12 through 20 recite computer-program products with instructions to perform the operations of those methods. (*Id.*). Also like the claims in the '219 patent, none of

4

these claims specifically claim the movement or location sensors used in the mobile device, nor the idea of using those sensors to obtain movement and location measurements.

## II.     Legal Standards

### A.     Motion to Dismiss

Fed. R. Civ. P. 12(b)(6) provides that a defendant may assert by motion that the plaintiff has failed to state a claim upon which relief may be granted.  When such a motion is made, a challenged claim is evaluated under Fed. R. Civ. Pro. 8(a)(2), which states that a plaintiff's claim for relief must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  The complaint need not contain detailed factual allegations, but conclusory allegations and "formulaic recitation[s] of the elements of a cause of action" are insufficient to give the defendant fair notice of the nature of and grounds for the claim.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In evaluating the claims, a court must assume that all factual allegations in the complaint are true and dismiss the claim if those allegations do not state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009).  While this plausibility standard requires more of the complaint than allegations supporting the mere possibility that the defendant is liable as alleged, plausibility should not be taken to mean probability.  *Id.*  at 678.  A claim is facially plausible, and the standard is satisfied, when the claim's factual allegations, accepted as true, allow the court to reasonably infer that the defendant is liable as alleged.  *Id.*

### B.     Patent Eligibility

Section 101 of the Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court recognizes three categories of ineligible subject

matter: laws of nature, natural phenomena, and abstract ideas. *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 70 (2012). The purpose of these exceptions is to protect the "basic tools of scientific and technological work." *Id.* at 71. Because all inventions rely on one of these exceptions at some level, however, these exceptions should not be too broadly construed, and applications of them may be patentable. *Id.* "Whether a claim recites patent eligible subject matter is a question of law which make contain disputes over underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).

To strike this balance, the Supreme Court established a two-step analytical framework for determining whether a patent recites eligible subject matter in *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208 (2014). At step one, a court looks to determine whether the claims at issue are directed to an ineligible concept. *Id.* at 218. The first step directs the court to examine the "focus" of the claims and look at their "character as a whole." *Elec. Power Grp., LLC v. Alstom S.A.* 830 F.3d 1350, 1353 (Fed. Cir. 2016) (internal citations omitted). In conducting the inquiry at step one, although the specification may help "illuminate the true focus of a claim," reliance on the specification must always "yield to the claim language" in determining the focus of the claims. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 766 (Fed. Cir. 2019). It is not enough to determine that there is a patent-ineligible concept underlying the claim; rather, the court must determine whether the claims are "directed to" that patent-ineligible concept.

If the claims are directed to a concept that is patent-ineligible, then the court must proceed to step two. At step two, the court considers the "elements of each claim both individually and as an ordered combination" to determine if there is an "inventive concept—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18

(cleaned up). The standard step two inquiry includes consideration of whether the claim elements "simply recite 'well-understood, routine, conventional activit[ies].'" *Bascom Glob. Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016) (quotations omitted). Accordingly, a claim that "recites an abstract idea must include additional features to ensure that the claim is more than a drafting effort designed to monopolize the abstract idea." *Alice*, 573 U.S. at 221. Moreover, the "prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of the idea to a particular technological environment." *Id.* at 222. Thus, simply "reciting the use of a generic computer or adding the words 'apply it with a computer' does not transform a patent-ineligible concept into patent eligible subject matter." *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017) (quoting *Alice*, 573 U.S. at 223). To save a patent at step two of the analysis, "an inventive concept must be evident in the claims." *RecogniCorp, LLC v. Nintendo Co. Litd.*, 855 F.3d 1322, 1327 (Fed. Cir. 2019).

"At both steps one and two, it is often useful to compare the claims at issue with claims that have been considered in the now considerably large body of decisions applying § 101." *Align Tech., Inc. v. 3Shape A/S*, 339 F. Supp. 3d 435, 443 (D. Del. 2018).

## III.   Discussion

Zendrive contends that the claims of the '219 patent and the '872 patent are invalid under § 101. For purposes of this motion, I will treat claim 1 of the '219 patent and claim 1 of the '872 patent as representative. "Courts may treat a claim as representative in certain situations, such as if the patentee does not present any meaningful argument for the distinctive significance of any claim limitations not found in the representative claim or if the parties agree to treat a claim as representative." *Berkheimer*, 881 F.3d at 1365. In its briefing, CMT devoted one half-page of its twenty pages to arguing that the dependent claims of the '219 patent should be considered

separately from Claim 1 of the '219 patent.[1]  Its argument included little more than reciting the

dependent claims ("[f]or example, claim 2 adds "two or more approaches to verifying" movement

measurements.  Claim 3 adds a step of determining unverified movement measurement based on

a comparison of an accuracy estimate . . . .  The dependent claims of the '219 patent should be

considered separately from claim 1 of the '219 patent.").  (D.I. 21 at 20).  Under these

circumstances, I am not persuaded that CMT presented the requisite meaningful argument for the

"distinctive significance" necessary to differentiate the representative claim from the other claims.

With respect to the '872 patent, CMT did not include any argument on representativeness at all in

its briefing and thus failed to dispute Zendrive's assertion that claim 1 of the '872 patent is

representative.  In its Supplemental § 101 Letter, however, CMT devoted a footnote to saying that

it now disagreed that claim 1 of the '872 patent was representative.  Because CMT passed on

---

[1]      Even if I were to analyze the dependent claims separately, my analysis and
recommendation would not change.  At the very least, each claim in the first set of claims of the
'219 patent is representative of the corresponding claim in the second set of claims in the same
patent.  The second set of claims of the '219 patent simply recite the claims of the first set in a
specific technological environment, and they are accordingly no different in substance.  The
Supreme Court used this same reasoning in *Alice* to decide that the system claims and the method
claims at issue there rose or fell together.  *See* 573 U.S. at 226–27.  To handle claims that are the
same in substance differently would be to "make patent eligibility 'depend simply on the
draftsman's art.'"  *Id.* at 226 (quoting *Mayo*, 566 U.S. at 72).  The Supreme Court has repeatedly
warned against doing so, *id.*, and so I will treat claims 1 through 9 of the '219 patent as
representative of the corresponding claims 10 through 18.
        Doing so, and for the reasons set forth in the body of this Report and Recommendation
relating to claim 1 of the '219 patent, I find that all claims of the '219 patent are ineligible.
Dependent claims 2 through 9 recite additional data processing steps beyond the steps recited in
claim 1.  (D.I. 1-2).  Just as with claim 1, none of the claims that depend from it recite a specific
technological improvement; rather, they simply take the result claimed in claim 1 and add
additional abstract data processing steps.  Similarly, just as CMT made no plausible allegation as
to the unconventionality of the data processing in claim 1, CMT has made no plausible allegations
as to the unconventionality of the associated dependent claims.  Rather, CMT simply alleges
unconventionality as a conclusion without including enough factual detail to raise the allegations
of unconventionality to the level of plausibility.  (D.I. 21 at 20).  Accordingly, claims 1 through 9
of the '219 patent are all ineligible.  Since they are representative of claims 10 through 18, claims
10 through 18 are also ineligible.

raising the argument in its brief, and the only argument in the Letter was presented through a somewhat cursory footnote, I find the argument with respect to the '872 patent waived and not substantively meaningful.

### A. The '219 Patent

#### a. *Alice*, Step One

Zendrive contends that claim 1 of the '219 patent is directed to the abstract idea of "data gathering and manipulation." (D.I. 15 at 15); (6/23/23 Tr. ("Tr.") 26:16–24) ("[I]t's directed to a claim that has two steps . . . for gathering information. And then it has three steps for calculating information based on what was gathered."). CMT complains that Zendrive oversimplifies the asserted claim, and in doing so improperly focuses on the first term of each limitation and fails to consider the claims as a whole. (D.I. 21 at 14–15). CMT argues that the patents are directed to "using inertial sensors to determine vehicle movement measurements and to detect driving events," (D.I. 21 at 2), and that claim 1 of the '219 patent is directed to "using a movable sensor to gather and collect data." (Tr. 70:7–13).

The Federal Circuit has repeatedly held that claims focused on "collecting information, analyzing it, and displaying certain results of the collection and analysis" are directed to an abstract idea. *See Elec. Power*, 830 at 1353–56. A review of *Elec. Power* is helpful here. In that case, the representative claim recited "[a] method of detecting events on an interconnected electric power grid in real time over a wide area and automatically analyzing the events on the interconnected electric power grid . . . ." *Id.* at 1351. The method involved gathering data from various sources, "detecting and analyzing events in real-time," and displaying the results. *Id.* at 1352. The Federal Circuit held that these steps were abstract, as they did not "go beyond requiring the collection, analysis, and display of available information in a particular field, stating those functions in general

terms, without limiting them to technical means for performing the functions that are arguably an advance over conventional computer and network technology." *Id.* at 1351.

Zendrive argues that claim 1 of the '219 patent simply "recites a series of functional, results-oriented steps for gathering and manipulating sensor data." (D.I. 15 at 15). In particular, Zendrive says that claim 1 calls for "[a]-[b] 'operating' sensors to collect movement and location data [c] 'verifying' the collected movement data using the location data, [d] 'removing' unverified data and [e] 'determining a movement event' using the remaining data." (*Id.*). In evaluating Zendrive's arguments and determining what the claim is "directed to," I read claim 1 in light of the specification, but my reliance on the specification must always "yield to the claim language" in determining the focus of the claim. *ChargePoint,* 920 F.3d at 766. In so yielding, these steps reveal that the focus of the claim is on the selection and manipulation of information, or data, its analysis, and reporting the results of the analysis. This is abstract.

CMT contends that claim 1 is not mere data collection and manipulation because, unlike *Elec. Power,* "CMT's claims identify a particular tool for presentation (a mobile device) which is used for improved telematics in the context of mobile devices." (D.I. 21 at 16). CMT's argument sounds a lot like "apply it with a computer," which does not pass muster. *Two-Way Media,* 874 F.3d at 1338.

In support of eligibility, CMT relies on *Thales Visionix Inc. v. United States*, in which the Federal Circuit considered the eligibility of a system for tracking the motion of a body relative to a moving reference frame using inertial sensors. 850 F.3d 1343 (Fed. Cir. 2017). Instead of measuring inertial changes with respect to the earth as prior art systems did, the claimed system measured gravitational forces directly with the reference frame sensors, and the sensors attached to the moving body calculated its position relative to the moving platform. *Id.* at 1346. The

10

Federal Circuit held that, while mathematical techniques were necessary to enable the technology in question to function, the claim was not directed to those techniques. *Id.* at 1349. Rather, the claims "specified a particular configuration of inertial sensors and a particular method of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform" and accordingly were directed to "a new and useful technique for using sensors to more efficiently track an object on a moving platform." *Id.*

Zendrive argues that *Thales* is inapplicable because the invention in *Thales* provided a new configuration of sensors, unlike here, and that I should instead be guided by *iLife Techs., Inc. v. Nintendo of Am., Inc.*, where the Federal Circuit held that a superficially similar system was directed to an abstract idea. 839 F. App'x 534 (Fed. Cir.), *cert. denied*, 142 S. Ct. 109 (2021). In *iLife*, the asserted patent claimed a system that tracked the motion of a body relative to its environment using both dynamic and static acceleration information collected from a sensor on the moving body. *Id.* at 535–36. The court explained that this system was directed to an abstract idea because, unlike the system in *Thales*, it was not directed to any specific physical configuration of sensors. *Id.* at 537. Furthermore, the claim recited no other specific means or method to improve motion sensor systems and "merely recite[d] a motion sensor system that evaluates movement of a body using static and dynamic acceleration information." *Id.* The Federal Circuit found that it was therefore directed to the mere processing and transmission of information. *Id.*

Zendrive has the better argument here. In *Thales*, not only was a novel and specific sensor arrangement disclosed, but the claims covered the techniques for enabling the use of the sensors. *See Thales*, 850 F.3d at 1349 ("[T]he claims seek to protect . . . the application of physics to the unconventional configuration of sensors as disclosed."). Here, unlike in *Thales*, claim 1 does not recite any specific physical configuration of sensors. Instead, the method requires only "operating

11

a movement sensor of a mobile device disposed in a vehicle." ('219 patent, D.I. 1-2 at 10:30–32).

The Federal Circuit and courts in this District have rejected attempts to apply *Thales* to claims that

lack a specific and novel hardware arrangement. *See iLife*, 839 F. App'x at 535–37 (distinguishing

*Thales* because the claimed technology was not focused on a specific means to improve the sensor

systems nor directed a specific physical configuration of the sensors); *Automated Tracking Sols.,*

*LLC v. Coca-Cola Co.*, 723 F. App'x 989, 994 (Fed. Cir. 2018) (distinguishing *Thales* because the

representative claims at issue did not require a "particular configuration or arrangement of the

RFID system components"); *Mgmt. Sci. Assocs., Inc. v. Datavant, Inc.*, 510 F. Supp. 3d 238, 248

n.1 (D. Del. 2020) (distinguishing *Thales* because the claims involved "no physical components

other than generic computers"); *IPA Techs., Inc. v. Amazon.com, Inc.*, 352 F. Supp. 3d 335, 345–

46 (D. Del. 2019) (distinguishing *Thales* because the patents "recite conventional steps" and

"conventional technology to implement these steps"). Here, too, the claim involves no physical

components other than a generic mobile device.

To bring this case closer to *Thales*, CMT advanced a new argument at the hearing. That

is, CMT argued that the term "disposed" in claim 1 should be construed to mean "placed in a

movable position." (Tr. 54:10–12). In doing so, CMT argued that its "specific hardware

arrangement" vis-a-vis *Thales* was that there was no specific hardware arrangement required at

all. The first time CMT raised this construction was at oral argument after having passed on the

chance to raise it in its briefing or its Supplemental § 101 Letter. I would accordingly be within

my rights to find that CMT has waived this argument and not consider it at all. *See, e.g., Watkins*

*v. International Union, Security, Police and Fire Professionals of America*, No. 15-444, 2016 WL

1166323, at *4 n.4 (D. Del. Mar. 23, 2016) ("[b]ecause this argument was made for the first time

at the hearing, the Court will not consider it") (citing cases).  But, even if I do consider the late-raised construction, I am not persuaded that it changes anything.

CMT's construction of "disposed" allows it to argue that the novel hardware configuration is that the mobile device is not required to be in a fixed position.  Even accepting this argument and the associated construction, however, the claim recites no techniques for enabling this configuration, whereas in *Thales* the claims covered the techniques for enabling the use of the sensors.  *See Thales*, 850 F.3d at 1349 ("[T]he claims seek to protect . . . the application of physics to the unconventional configuration of sensors as disclosed.")  Rather, the claim here takes the supposedly nonabstract facet of the invention—the ability to collect vehicle movement data using a mobile device that is not held in a fixed position—and assumes it, thereafter only providing additional instructions for what to do with the data that is collected.  The operation of the mobile device does not change in any way; the claim merely recites techniques for making use of the data that the mobile device already provides.  In other words, claim 1 simply claims a result and then adds additional data processing steps without claiming any specific improvement in the computer technology itself.  Accordingly, like the claim in *iLife*, the claim here is not *directed to* any particular configuration of sensors even if it relies on data from sensors configured in some arrangement (or no arrangement at all).

Moreover, I am not persuaded by CMT's suggestion that its claim is patent-eligible because of its novelty over prior methods which apparently required the vehicle sensor to remain fixed within the vehicle.  As the Federal Circuit has explained, "it is not enough for eligibility" that the techniques claimed are "[g]roundbreaking, innovative, or even brilliant" or "novel and nonobvious in light of prior art."  *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018).

CMT also contends that issues of claim construction (beyond "disposed") make it imprudent for the Court to recommend granting the motion to dismiss. I disagree. With respect to claim construction, a court need not necessarily engage in claim construction prior to determining eligibility at the motion to dismiss stage. *Genetic Techs. Ltd. v. Merial L.L.C.*, 818 F.3d 1369, 1374 (Fed. Cir. 2016). Nevertheless, "[d]etermining patent eligibility requires a full understanding of the basic character of the claimed subject matter," and if a claim construction dispute is raised, courts must "either adopt the non-moving party's constructions or resolve the dispute to whatever extent is needed to conduct the § 101 analysis." *MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379 (Fed. Cir. 2019). Even if a court chooses to resolve the claim construction dispute as part of addressing the eligibility issue, however, it need not necessarily do so through a full, formal claim construction process. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018).

CMT's proposed construction in its brief and Supplemental § 101 Letter focused on the meaning of the term "verifying" in claim 1 of the '219 patent. CMT stated that "verifying" should be read to mean "processing raw sensor data to detect and remove erroneous measurements." (D.I. 21 at 8; D.I. 30 at 3). As above, at oral argument, CMT proposed for the first time a construction of "disposed," arguing that this term is crucial. While I find the arguments for CMT's proposed constructions generally unpersuasive (and its latter one technically waived), as below, a more fulsome construction of the terms is unnecessary as the proposed constructions do not change my eligibility analysis.

Zendrive argues that CMT's proposed construction of "verifying" is improperly derived from exemplary embodiments and that adopting this construction would create conflicts with other claims that issued from the same applications. (D.I. 23 at 2–3). Construing "verifying" to mean

14

"processing data to detect and remove" would render the next limitation—"removing"—to be superfluous. (*Compare* D.I. 1-2 at 10:37–38, *adjusted with proposed construction* ("[processing raw sensor data to detect and remove erroneous measurements], by a processor of the mobile device, a portion of the plurality of movement measurements") *with* D.I. 1-2 at 10:40–41 ("removing, by the processor, one or more movement measurements that are not verified from the plurality of movement measurements"). Even if adopted for the sake of argument, however, the proposed construction for "verifying" in the '219 patent merely provides a statement of what the claims are already meant to accomplish. Indeed, the construction "adds" the concept of removing erroneous measurements, but that step is already performed in limitation 1[d] ("removing … measurements that are not verified"). At worst, this construction conflicts with or renders superfluous other terms; at best, it just adds another data processing step, which does not bring claim 1 out of the realm of abstraction. Moreover, in proposing its constructions, CMT failed to "articulate how adoption of the construction would materially impact the analysis at step one (and/or at step two)," as required. *Sanderling Management Ltd. v. Snap Inc.*, 65 F.4th 698, 704 (Fed. Cir. 2023).

CMT argues that there is a factual dispute as to whether a human could perform the claimed process mentally or with a pen and paper and that this issue prevents resolution of the eligibility question at this stage. As the Supreme Court noted, "[a] digital computer…operates on data expressed in digits, solving a problem by arithmetic as a person would do it by head and hand." *Gottschalk v. Benson*, 409 U.S. 63, 65 (1972). It seems to me, then, that if a computer is capable of running an algorithm or analyzing data, a human is equally capable of doing so given enough time and enough paper. The claims at issue here consist entirely of steps taken by a computer. The claims are not directed to sensors or devices themselves; rather, they are directed to collecting

15

and manipulating data that was obtained from the sensors. A human is equally capable of doing the same. Even if there were a genuine question as to whether a human could perform the steps in the claims, however, CMT has not identified any Supreme Court or Federal Circuit authority that suggests that this particular open question by itself could preclude resolving the eligibility question.

Last, CMT argues claim 1 of the '219 patent cannot be abstract because the claimed invention has a "real-world impact" in that it detects changes in the physical environment and the occurrence of driving events using tangible devices. (D.I. 21 at 12). In support of this argument, CMT cites *Carrum Techs., LLC v. BMW of N. Am., LLC*, No. 18-1645, 2019 WL 1779863 (D. Del. Apr. 23, 2019) (holding that an improved adaptive cruise control system had a tangible, real-world impact and was therefore not directed to an abstract idea) and *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533 (D. Del. 2019) (holding that a method for automatically controlling access to an area using an automated system to identify a person and determine if that person had authorized access was not directed to an abstract idea). Neither case helps CMT. The inventions in *Carrum* and *Axcess* had real-world impact because they, without further human intervention, altered real-world conditions based on what they had detected—not that they simply *detected* things in the real world. *See Axcess*, 375 F. Supp. 3d at 537 ("The asserted claims . . . are directed to using RFID equipment and video to remotely watch over, and *limit access to*, property.") (emphasis added); *Carrum*, 2019 WL 1779863 at *3 ("The claims are directed to a physical system operating in three-dimensional space that, when certain conditions are met, physically impacts the speed of a moving object."). While CMT's claimed invention may detect certain real-world events, it does not have any such "real-world impact."

16

For the foregoing reasons, I conclude that representative claim 1 of the '219 patent is directed to an abstract idea.

### b. *Alice*, Step Two

If a claim is directed to an abstract idea, then step two of the *Alice* framework requires a court to assess "[w]hat else is there in the claims"; a court does so by considering "the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements transform the nature of the claim into a patent-eligible application." *Alice*, 573 U.S. at 217 (internal quotation marks and citation omitted).

In conducting this "inventive concept" inquiry, the Federal Circuit has looked to the claims as well as the specification. *See Affinity Labs of Texas, LLC v. Amazon.com Inc.*, 838 F.3d 1266, 1271 (Fed. Cir. 2016) ("[N]either the claim nor the specification reveals any concrete way of employing a customized user interface."). Thus, it is not enough just to disclose the improvement in the specification; instead, the Court's task becomes to "analyze the asserted claims and determine whether they *capture these improvements*." *Berkheimer*, 881 F.3d at 1369 (emphasis added). In other words, "[t]o save a patent at step two, an inventive concept must be *evident in the claims*." *RecogniCorp*, 855 F.3d at 1327 (emphasis added); *see also Alice*, 573 U.S. at 221 ("[W]e must examine the *elements of the claim* to determine whether it contains an 'inventive concept.'") (emphasis added); *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016) ("The § 101 inquiry must focus on the language of the Asserted Claims themselves.").

CMT does not identify any proposed inventive concept in its Complaint. CMT simply says, "[f]irst, the ordered elements of the claims, taken as a whole, were not 'well-understood, routine, and conventional' in the prior art." (D.I. 21 at 18). CMT argues that "the mobile device is not a generic tool, but rather an integral part of the invention to detect driving events and distracted driving." (*Id.* at 19). This appears to be the lion's share of CMT's argument on what

17

provides the inventive concept. I am not persuaded that CMT's argument can carry the day for at least three reasons. First, CMT fails to identify what the inventive concept is. CMT does not clearly identify what aspect or aspects of the claim amount to an inventive concept, nor does the claim itself make clear on its face what the inventive concept is. And, while I must accept factual allegations as true at this stage, there are no accompanying factual allegations on this point in the Complaint for me to accept as true. Instead, here, CMT advances a conclusory argument that is essentially a recitation of the legal standard.

CMT urges me to read the claims in light of the specification to find the inventive concept. But neither the claim nor the specification really explains what is inventive about using a sensor from a mobile device, or the gathering or manipulation of data, alone or in combination with other steps of the claim. Indeed, the specification repeatedly explains that the mobile devices being used are generic, general-purpose mobile devices.[2] (*Id.* at 4:44–47) ("Exemplary mobile devices include smart watches, wearable devices, fitness monitors, Bluetooth headsets, tablets, laptop computers, smart phones, music players, movement analysis devices, and other suitable devices."). The claimed systems and methods do not improve how the abstract ideas of data gathering and manipulation are accomplished or apply the concepts in a new way. Rather, the systems and methods implement the abstract idea of data gathering and manipulation using well-known and generic mobile components and functionalities. There is nothing in the elements of the claim that capture any claimed improvement, nor is there anything that discloses a concrete way of employing the claimed invention.

---

[2]    The specification of the '872 patent does the same. *See* (D.I. 1-5 at 4:10–13) ("not limited to any particular mobile device"); (*Id.* at 4:18–22) ("smart watches, wearable devices, fitness monitors, Bluetooth headsets, tablets, laptop computers, smart phones, music players, movement analysis devices, and other suitable devices" can be used).

This case is not like, for example, *Berkheimer*. Here, the specification does not describe in detail what the claimed improvement is, how it differs from the prior art, or how any inventive feature—either alone or as part of an ordered combination—is used in some unconventional manner. *Berkheimer*, 881 F.3d at 1369 (("The specification explains that the claimed improvement increases efficiency and computer functionality over the prior art systems . . . . The specification describes an inventive feature that stores parsed data in a purportedly unconventional manner."). Even if I could find an inventive concept in the specification, however, the '219 patent fails to do what the Federal Circuit instructs that it must—that is, the claim does not "capture these improvements," *Berkheimer*, 881 F.3d at 1369, and such improvements are not "evident in the claims," *RecogniCorp*, 855 F.3d at 1327; *see also Two-Way Media*, 874 F.3d at 1336 ("The main problem that Two-Way Media cannot overcome is that the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept."). The limitations in claim 1 contain no inventive concept that transforms the abstract idea of data gathering and manipulation into a patent-eligible application of the abstract idea.

At argument, CMT reverted to relying on its newly proposed construction of "disposed," essentially attempting to bake an inventive concept into the construction and explaining that the fact that the mobile device was not fixed is the new and inventive configuration. But although the Supreme Court used the term "inventive concept" to describe what it is that helps the patentee survive step two, "the search for an inventive concept is not about whether the claimed element in question is new or unique." *WSOU Investments, LLC v. Netgear, Inc.*, No. 21-1119, 2022 WL 2753005, at *3 (D. Del. July 14, 2022) (citing *Affinity Labs. Of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1263 n.3 (Fed. Cir. 2016)). Instead, an "inventive concept" is simply "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to

significantly more than a patent upon the ineligible concept itself." *Alice*, 573 U.S. at 217–18. Even assuming CMT's construction of "disposed," however, the '219 patent remains a patent upon the ineligible concept of collecting, manipulation, and analyzing data.  That the mobile device is not fixed does not "ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.*  Applying CMT's proposed construction, the claims would still claim only the result of a mobile device that is not fixed in a particular position.  The techniques necessary to make use of a moveable mobile device, assuming this new construction, are not captured in any of the claims of the '219 patent, so CMT therefore cannot point to these techniques as the basis for their allegations that the claims cover unconventional activities.

So, instead, CMT alleges that it is an open question "[w]hether the claims, as an ordered combination, including the first 'obtaining' limitation and the first 'generating' limitation, disclose 'well-understood, routine, and conventional' activities," and that this open question, since Zendrive disagrees, creates a factual dispute precluding resolution of the eligibility question.  (D.I. 18 at 18 ("First, the ordered elements of the claims, taken as a whole, were not 'well-understood, routine, and conventional' in the prior art"); D.I. 30 at 2).  But whether considered individually or as an ordered combination, the claim elements of the '219 patent teach no more than the performance of "well-understood, routine, and conventional" activities that were previously known in the industry. *Alice*, 572 U.S. at 225.  The only purported difference between the prior methods and the claimed invention is that the patent's method can be carried out, CMT argues, by a mobile device that is, well, mobile.  But as the patent itself discloses, collection, manipulation and analysis of sensor data is well-understood, as is the use of sensors to collect data, as are mobile devices, and as is data analysis.  Simply taking all of that well-understood technology and saying "now apply it with a computer" (here, a moveable computer) is not sufficient to transform an

unpatentable abstract idea into an patent-eligible abstract idea. Where, as here, a claim's only inventive concept "is the application of an abstract idea using conventional and well-understood techniques, the claim has not been transformed into a patent-eligible application of an abstract idea." *Sanderling*, 65 F.4th at 698; *Customedia Techs., LLC v. Dish Network Corp.*, 951 F.3d 1359, 1366 (Fed. Cir. 2020) ("[T]he invocation of 'already-available computers that are not themselves plausibly asserted to be an advance . . . amount to a recitation of what is well-understood, routine, and conventional.'").

CMT further argues that the claims must not cover well-understood, routine, and conventional activities since the USPTO examiner found them novel over the prior art. (D.I. 21 at 18). I am not persuaded by this argument. Obviously, the fact that the Examiner did not find claim 1 of the '219 patent to be ineligible is not binding on this Court, and it does not end the Court's inquiry. *See Elec. Commc'ns Techs., LLC v. ShoppersChoice.com, LLC*, 958 F.3d 1178, 1183 (Fed. Cir. 2020); *Reputation.com, Inv. v. Birdeye, Inc.*, No. 21-129, 2022 WL 609161, at *6 (D. Del. Jan. 31, 2022). Moreover, the Examiner did not provide an analysis or explanation in support of his conclusion that "[t]he art of record does not disclose the above limitations, nor would it be obvious to modify the art of record so as to include the above limitations." (D.I. 21 at 18). The lack of factual analysis hurts CMT's ability to inject a fact dispute here, especially in light of the fact that the thing the Examiner cited as not being disclosed is little more than a re-statement of the abstract idea at issue (*i.e.*, processing and analyzing data).

CMT makes a series of additional arguments on inventiveness but, ultimately, I am not persuaded by any of them. CMT argues that the '219 is inventive because it does not "merely recite the performance of some business practice known from the pre-Internet world." (D.I. 21 at 18). CMT does not elaborate on this argument, but I cannot see how it helps CMT's case because

21

that is not the test for abstraction. CMT also argues for an inventive concept by comparing the patent to the claimed method in *ART+COM Innovationpool GmbH v. Google Inc.*, 183 F. Supp. 3d 552, 560 (D. Del. 2016) because the patent is not "merely what a computer does" but is instead a "specific procedure done by a computer." (D.I. 21 at 19). But, unlike the method in *ART+COM*, the '219 patent does not describe any improvement to a specific procedure that is performed by a computer. Instead, the patent makes clear that it gathers data from the sensors within a generic mobile computing device to analyze it.

CMT also argues that the '219 patent can only be found ineligible if it completely preempts the entirety of abstract ideas to which the patent is directed. "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate patent eligibility . . . . Where a patent's claims are deemed only to disclose patent ineligible subject matter under the Mayo framework . . . preemption concerns are fully addressed and made moot." *Ariosa Diagnostics v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015); *OIP Techs., Inc. v. Amazon, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015) ("[T]hat the claims do not preempt all price optimization . . . do[es] not make them any less abstract."). In this instance then, it is not necessary to determine the exact degree to which CMT's claims might preempt the field. It is enough to apply the *Alice/Mayo* test, as above. *See Ariosa*, 788 F.3d at 1379.

As support for its position that preemption must be considered as a possible fact dispute, however, CMT cites *Ultramercial v. Hulu*, 722 F.3d 1335, 1339 (Fed. Cir. 2013). This decision was subsequently vacated by the Supreme Court in *WildTangent, Inc. v. Ultramercial, LLC*, 573 U.S. 942 (2014), and on remand the Federal Circuit did not address the preemption question. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709 (Fed. Cir. 2014). As an initial matter, *Ultramercial* precedes both *Ariosa* and *OIP Techs.*, above. Moreover, that the Federal Circuit did not address

22

preemption as a fact question on remand at the very least undermines CMT's assertion that I must determine exactly how much of the field is preempted by the claims to issue a recommendation on this motion to dismiss.

Last, CMT argues at least in part that the claimed invention is patentable under § 101 because it "can improve the performance of a computer system processing collected movement measurement data, and improve the data produced by movement sensors." '219 patent, (D.I. 1-2 at 8:1–5). But other than this single reference, the '219 patent does not claim or teach the improvement of technology. Instead, the claim describes a multi-step process to gather and manipulate data; it says nothing about changing the functionality of a computer processing system or the sensors. There is no reference in the claims whatsoever to improving computer system processing or the mobile device sensors.

For all the reasons set out above, I conclude that representative claim 1 of the '219 patent does not recite an inventive concept.

## B. The '872 Patent

### a. *Alice, Step One*

The parties' arguments with respect to the '872 patent mirror their arguments with respect to the '219 patent. Where the arguments are identical or where they were generically applied across the two patents, I do not rehash them. But where an argument is unique to the '872 patent, I address it herein.

Zendrive contends that claim 1 of the '872 patent is directed to "data gathering steps of obtaining, generating, and displaying." (Tr. 83:2–6). "[I]t recites the functional steps of: [a] 'obtaining' measurements from a mobile device's sensors during a drive, [b] 'generating ... an association' between a subset of those measurements and a 'driving event,' [c] 'generating' metrics indicating the percent of the drive that the user was 'focused' and the percent s/he was using the

23

mobile device, and [d] 'generating' and then [e] 'displaying' a graphical image of the 'driving event' and the calculated metrics." (D.I. 15 at 7–8). As with the '219 patent, Zendrive argues that claim 1 amounts to little more than a series of steps for gathering, manipulating, and displaying data, and it points to *Elec. Power*, 830 F.3d at 1352–54 (recognizing that claims that are directed to data manipulation and data organization are a "familiar class of claims 'directed to' a patent-ineligible concept"). Like the claims in *Elec. Power*, Zendrive argues, these claims are directed to the abstract idea of "collecting information, analyzing it, and displaying certain results of the collection and analysis." (D.I. 15 at 8) (citing *Elec. Power*, 830 F.3d at 1351–53). I agree. Each of the steps in claim 1 of the '872 patent is a data collection or data processing step, culminating with displaying. This is abstract.

CMT argues, as it did with the '219 patent, that Zendrive fails to consider the claims as a whole in determining what the invention is "directed to." CMT argues that claim 1 of the '872 patent is directed to "vehicle telematics methods and systems that use inertial sensors to determine vehicle movement measurements, and to detect driving events and distracted driving." But this, too, amounts to little more than *obtaining* data from a sensor (or multiple sensors within a mobile device), *manipulating* the data, and *displaying* it. CMT likens claim 1 of the '872 patent to *Thales* but, as with the claims of the '219 patent, I am not persuaded that this claim is like those in *Thales*, and the additional step of "displaying" in the '872 patent does not change the analysis. Rather, my reasoning in the comparison of claim 1 of the '219 patent to the claims in *Thales* and *iLife* above applies equally to claim 1 of the '872 patent; accordingly, I am persuaded that this claim is similarly more like the claim in *iLife*, and therefore directed to an abstract idea.

Zendrive also argues that claim 1 is abstract because it fails to recite any particular *way* of performing the recited steps. (D.I. 15 at 9). Step [a] calls for "obtaining" measurements by

24

operating at least one sensor, but provides nothing about how that function is performed; similarly

[b], [c], and [d] call for "generating" data using a generic processor, but do not say how the

calculations are performed, nor do they provide some novel software or hardware structure to

achieve the result.  As a result, Zendrive, argues, the claim limitations "purport to cover *all forms*

of data manipulation (on all forms of processors) that produce the resulting information."  (*Id.*).

And, moreover, Zendrive argues that the limitation is actually directed to the "*idea* of obtaining

data using a sensor," rather than a way of performing that task.  (*Id.*).  CMT counters that (1) the

claim language is comparable to the claim language in *Thales*, which the Federal Circuit found

patent eligible, and (2) that the court need only look to the specification of the '872 patent for the

necessary information that Zendrive claims is lacking.  As above, I find the analogy to *Thales*

unpersuasive on these facts.

I am also not persuaded by CMT's argument that I need not be bothered by the lack of

"how" in the claims because all of the necessary information for how to achieve the claimed

functions is in the specification.  Here, CMT points to the '872 patent's specification, and then to

U.S. Patent Application Serial No. 14/749,232 (filed Jun. 24, 2015), which is incorporated by

reference into the specification of the '872 patent (along with three other applications).  In the '232

application, the following techniques are provided: "determin[ing] gravity vector[s] of a mobile

device as a function of time; "processes to detect and classify driving features using classifier 214";

"determin[ing] acceleration vectors using vector analyzer 258 and vector determining 259; and

"analyzing the data collected by the mobile device, [by] remov[ing] the portion of the data

collected while the mobile device was moving from the bag to the dashboard."  (D.I. 21 at 13)

(citing to D.I. 22-2).  But none of this *how* is included in claim 1 of the '872 patent.  So, while an

application incorporated by reference into the specification might say how to do it, the claims

25

don't. As here, "a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea." *Charge Point*, 920 F.3d at 769.

CMT further argues, as it did with the '219 patent, that claim construction is necessary for a § 101 analysis in this case.[3]  In its brief, CMT argued that "obtaining" should be construed as "obtaining raw sensor data and transforming that raw sensor data into," and that "operating" should be construed as "determining a plurality of gravity vectors and the differences between them using." (D.I. 21 at 8).  Zendrive argues, in response, that CMT's proposed constructions are implausible at least because they are "derived from exemplary embodiments in the related '232 application rather than from a definition of 'obtaining' or 'operating.'" (D.I. 23 at 2).  In addition, Zendrive points out that CMT's proposed construction would vitiate and render superfluous limitations of the patent that issued from the '232 application, U.S. Patent No. 10,078,099 ("'099 patent").  At the hearing, CMT also urged the Court to construe "disposed" as discussed above.

I tend to agree with Zendrive, and, moreover, I am unpersuaded that anything changes even if I adopt CMT's constructions for purposes of this motion.  Even assuming CMT's constructions, the claims recite no techniques for enabling the claimed configuration.  The proposed construction of "obtaining" in the '872 patent just provides a statement of what the claim is meant to accomplish.  Similarly, the proposed construction for the term "operating" in the '872 patent only adds an additional data processing step.  Moreover, I agree with Zendrive that the proposed construction of "operating" in the '872 patent seems to conflict with the terms of claim 1 of the

---

[3]    CMT also argues that factual disputes make dismissal improper.  CMT does not raises any factual disputes unique to the '872 patent that were not also raised and considered in connection with the '219 patent—in fact, CMT does not distinguish between the patents at all in offering the factual disputes.   For the same reasons that I found those disputes do not preclude my recommendation on the '219 patent, I am similarly unpersuaded here.

'232 application (that matured into the '099 patent), which is incorporated in the '872 patent.  In the '232 application, on which CMT's construction is predicated (*see* D.I. 21 at 8), the phrase "operating at least one sensor" appears to mean something different than CMT's construction of "determining a plurality of gravity vectors and differences between them" because those concepts are already captured in the claim. (*See* D.I. 24-1 at 16:43–67)).  And, for "disposed," as discussed above, even with CMT's construction, the claims here take for granted the supposedly nonabstract facet of the invention, presupposing the ability to collect vehicle movement data using a mobile device that is not held in a fixed position and thereafter only providing additional instructions for what to do with the data that is collected.  The operation of the mobile device does not change; the claims merely recite techniques for making use of the data that the mobile device already provides.

Even with CMT's constructions, the claim still just claims a result and then adds additional data processing steps without claiming any specific technological improvement.  This is different than in *Thales* where the claims covered the techniques for enabling the use of the sensors.  *See Thales*, 850 F.3d at 1349 ("[T]he claims seek to protect . . . the application of physics to the unconventional configuration of sensors as disclosed.").  Accordingly, claim 1 remains directed to data collection, processing, and displaying.

For the foregoing reasons, I conclude that representative claim 1 of the '872 patent is directed to an abstract idea.

### b.  *Alice*, Step Two

I find that CMT's inventive concept arguments for the '872 patent suffer the same flaws as its arguments for the '219 patent.  As with the '219 patent, the inventive concept is not identified in the Complaint, nor could CMT clearly identify what aspect of claim 1 of the '872 patent amounted to an inventive concept, nor is it evident in the claims.  CMT's answering brief does not distinguish between the two asserted patents in advancing its argument on inventiveness. (*See* D.I.

21 at 18–19). Because CMT did not distinguish its argument on inventiveness between the two patents, I see no reason to do so. I addressed CMT's arguments on step two in the context of the '219 patent and I was unpersuaded for all the reasons set forth above. As a result, for the same reasons, I conclude that representative claim 1 of the '872 patent does not recite an inventive concept.

## IV. Conclusion

For the foregoing reasons, I recommend that the District Court GRANT Zendrive's Motion to Dismiss Counts II and IV of CMT's Complaint.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(l)(B), (C), Fed. R. Civ. P. 72(b)(l), and D. Del. LR 72.1. Any objections to the Report and Recommendation shall be filed within fourteen days and limited to ten pages. Any response shall be filed within fourteen days thereafter and limited to ten pages. The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the District Court.

The parties are directed to the Court's "Standing Order for Objections Filed Under Fed. R. Civ. P. 72," dated March 7, 2022, a copy of which is available on the Court's website.

The Honorable Laura D. Hatcher
UNITED STATES MAGISTRATE JUDGE

Dated: July 28, 2023